UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

PHOEBE R. BOGART,

                                 Plaintiff                      DECISION AND ORDER

-vs-

                                                       13-CV-6592 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                 Defendant.
_____

APPEARANCES

For the Plaintiff:                Justin M. Goldstein, Esq.
                                    Law Offices of Kenneth Hiller, PPLC
                                    6000 North Bailey Avenue, Suite 1A
                                    Amherst, New York 14226

For the Defendant:               Kevin D. Robinson, Esq.
                                    Assistant United States Attorney
                                    Federal Center
                                    138 Delaware Avenue
                                    Buffalo, New York 14202

                                  Sandra M. Grossfeld, Esq.
                                    Social Security Administration
                                    Office of General Counsel
                                    26 Federal Plaza, Room 3904
                                    New York, New York 10278

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Phoebe Bogart ("Plaintiff") for Social Security

Supplemental Security Income ("SSI") disability benefits.  Now before the Court is

1

Plaintiff's motion (Docket No. [#9]) for judgment and Defendant's cross-motion [#15] for judgment on the pleadings.  Plaintiff's application is granted and Defendant's cross-motion is denied.

PROCEDURAL HISTORY

On April 27, 2011, Plaintiff applied for SSI benefits, claiming that she became disabled on May 26, 2010. (141-147).  Plaintiff claims to be disabled due to the following conditions: "COPD,[1] "dislocated knee caps in both knees," "lower back pain," "soft tissue damage in neck," "disabled in left wrist," "severe depression" and "anxiety." (174).  On May 26, 2011, the Commissioner denied the application. (86-96).  The disability examiner who handled Plaintiff's application reported that Plaintiff had the following conditions:

> Claimant has [history of] back disorder, knee pain, wrist pain, COPD [chronic obstructive pulmonary disorder].  LS spine ROM as follows:  flexion to 80 degrees.  Bilateral knee ROM as follows: flexion/extension to 110 to 135 degrees.  LS spine MRI (11-03-03) indicated a protrusion at L5-S1 with a[n] annular tear and degenerative changes at L5-S1.  Bilateral knee x-rays (03-11-11) indicated lateral maltracking of the patella with associated patella alta.

(79).  Nevertheless, the examiner found that Plaintiff had the ability to lift ten pounds, sit for six hours in an 8-hour workday, and stand/walk for six hours in an 8-hour workday. (79).  Further, the examiner found that Plaintiff had the residual functional capacity to perform only "sedentary" work. (81).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and such hearing was held on May 24, 2012.  At the hearing, Plaintiff was represented by her

---

[1]Chronic Obstructive Pulmonary Disease

attorney.  On August 17, 2012, the ALJ issued a Decision, which, as will be discussed further below, found that Plaintiff is not disabled.  The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform "a range of light work" (23), and he further found, at step four of the five-step sequential analysis, that Plaintiff can perform her past relevant work as a receptionist.  Plaintiff appealed, and on September 20, 2013, the Appeals Council declined to review the ALJ's determination. (1-6).

On October 31, 2013, Plaintiff commenced this action.  The parties filed their respective motions for judgment on the pleadings, and on October 30, 2014, counsel for the parties appeared before the undersigned for oral argument.

MEDICAL EVIDENCE

As referenced above, the Defendant's disability examiner's notes allude to Plaintiff's various medical conditions, which include lower-back pain due to degenerative changes, knee pain due to "maltracking of the patella," and COPD secondary to smoking cigarettes.  Additionally, Plaintiff sustained a work-related injury to her wrist.  Plaintiff also has neck pain, which the medical notes attribute to her having been kicked by a horse.  Plaintiff has undergone various surgeries to address those problems, including back decompression, arthroscopic knee surgery, and arm surgery.  Plaintiff has also received various treatments, including pain injections and nerve ablation procedures.  Plaintiff takes a variety of prescription pain medications on a daily basis.  Plaintiff's back and knee problems seem to have the greatest effect on her ability to work, and consequently, the Court will briefly summarize the medical evidence concerning those conditions.

Back Pain

Plaintiff initially began experiencing pain in her lower back in 2004.  In or about 2005, Plaintiff was treated by Donovan Holder, M.D. ("Holder"), who administered "multiple injections" and performed "a disc decompression at L4-5." (263).  The decompression procedure relieved some of Plaintiff's pain, but also resulted in her experiencing pain in her buttock. *Id*.   On February 27, 2006, Plaintiff was seen by pain management specialist Naseer Tahir, M.D. ("Tahir"), who reported that an MRI of Plaintiff's lumbar spine "show[ed] a very small protrusion at L5-S1 with a small annular tear at the site," as well as "degenerative changes," but "no evidence of herniation or central canal or neuroforaminal narrowing." (263).  Upon examination, Tahir observed that Plaintiff was "quite distressed" due to pain, preferred to stand rather than sit, and walked favoring her right leg. (263).  Tahir reported that Plaintiff was "tender" over the L4-5 joint and the sacroiliac joint. (263).  Tahir noted that Plaintiff had pain with lumbar flexion and extension, and that when she attempted to stand just on her right leg, it caused pain and also caused her leg to shake excessively. *Id*.  Tahir further reported that Plaintiff had positive straight-leg testing ("SLR") bilaterally. *Id*.  Tahir's diagnosis was "low back pain more so on the right[, and] leg symptoms consistent with an L5-S1 radiculopathy." *Id*.

In March 2006 and April 2006, Tahir administered "transforaminal epidural steroid injections" and "sacroiliac joint injections." (255).  Tahir also tried a nerve ablation procedure. *Id*.  Tahir reported that the pain radiating into Plaintiff's leg was improved, but she still complained of pain over her "tailbone." *Id*.

On August 1, 2006, Tahir reported that Plaintiff was taking Percocet and

Oxycontin to alleviate her back pain. (255).  Tahir examined Plaintiff and reported that

she walked slowly, apparently due to pain. *Id*.  Palpation revealed tenderness over

Plaintiff's right buttock and sacroiliac joint, and she had a positive Patrick's test on the

right side. *Id*.  Tahir concluded, from the positive Patrick's sign, that Plaintiff's pain was

originating in the sacroiliac joint. *Id*.  Consequently, Tahir indicated that he would

administer injections "targeting L5, S1, S2 and S3," and that if Plaintiff experienced relief

from the injections he would offer to perform a nerve ablation procedure. *Id*.  The nerve

ablation procedure was performed, and Plaintiff reported that the procedure relieved her

back pain for several years, until 2010. (64).  Moreover, the record indicates that Plaintiff

worked between 2007 and 2010, after having not worked for several years. (149, 154).

In 2010, the pain in Plaintiff's back began to return.  On July 16, 2010, Lisa Walk-

Reinard, M.D. ("Walk-Reinard"), Plaintiff's primary care physician, reported that Plaintiff

was frequently shifting her position because she could not "get comfortable" due to back

pain. (376).  Walk-Reinard reported that Plaintiff had "marked pain on palpation of low

back S1-5 level," greater on the right than on the left, and that Plaintiff also had "marked

pain" over the right sacroiliac joint. *Id*. Walk-Reinard further reported a positive SLR test

on the right side. *Id*.  Walk-Reinard referred Plaintiff back to Tahir for pain treatment. (64,

376).

Tahir tried further nerve ablation treatment, but according to Plaintiff it was "a

complete failure." (64).  Consequently, Plaintiff returned to Holder for treatment.  On

October 25, 2010, Holder examined Plaintiff. (395-396).  Plaintiff told Holder that she was

experiencing significant pain, despite taking Gabapentin 600 mg, and that her sleep was

"markedly affected." (395).  Holder observed that recent diagnostic studies of the thoracic

spine were normal and that studies of the lumbar spine "showed no evidence of fracture."

*Id*. Upon examination, Holder reported that Plaintiff had some pain with lumbar flexion

and extension. (396). Holder further stated:

> Palpation of the cervical through lumbar spine revealed only diffuse
> tenderness throughout the entire torso. There was no evidence of
> significant cervical, thoracic, or lumbar facet pains. There was no evidence
> of sacroiliac joint pain or hip discomfort bilaterally. Seated straight leg
> raising was normal with increased low back pain only. Normal reflexes,
> motor and sensory examinations throughout.

*Id*. Holder concluded that, "[t]his patient's pain at this time is quite diffuse and suggestive

or a more musculoskeletal disorder with degenerative disc and low back pain. At this

time she is not a candidate for narcotic therapy. She should continue with nonsteroidal

and adjuvant agents only. " *Id*.

Shortly thereafter, on November 23, 2010, Plaintiff went to see David Moorthi,

M.D. ("Moorthi"), who specializes in "interventional spine & pain management." (498-

499). Plaintiff told Moorthi that she was trying physical therapy, but it was not helping.

(498). Moorthi reported that Plaintiff had a normal gait. *Id*. Upon examination, Moorthi

found "decreased lumbar lordosis" (curvature), and, upon palpation, found "severe

tenderness . . . over the lower lumbar spine." *Id*. Apart from this examination, it is

unclear whether Plaintiff received any treatment from Moorthi.

On May 11, 2011, Plaintiff had MRI testing of her lumbar spine, about which the

radiologist's report stated:

> Mild degenerative disc dessication is seen, most prominent at L5-S1 level.
> Mild facet degenerative change is seen bilaterally. In the lower lumbar
> spine mild disc bulging is seen with minimal ventral impression on the
> thecal sac. There is no evidence of disc herniation, spinal or significant

neural foraminal stenosis.

(608).

On May 27, 2011, Plaintiff had x-rays of her thoracic spine, about which the radiologist stated: "There is no evidence of compression fractures.  No significant degenerative changes are appreciated.  The pedicles are intact.  The paraspinal soft tissues are unremarkable." (434).

In or about June, 2011, Plaintiff began treating with Steven Lasser, M.D. ("Lasser"), an orthopedic specialist. (638-639).  Lasser examined Plaintiff and reported "tenderness to around L5-S1," and decreased range of movement in the spine. (639). Lasser's impression was "chronic lower back pain with facet arthropathy and mild degenerative disc disease." *Id*.  On July 15, 2011, Lasser examined Plaintiff again, and reviewed her most recent MRI scan. (638).  Upon examination, Plaintiff was "exquisitely sensitive around the L5-S1 and upper sacral levels," though her neurologic exam was "intact." *Id*.  Upon reviewing the MRI, Lasser reported:

> The images reveal healthy-looking lumbar disks with the exception of a very minimal dessication at L5-S1 and slight narrowing, but no sign of herniation or neurocompression.  X-rays of the lumbar spine obtained today, AP, lateral and flexion extension views.  There is no sign of a spondyloslysis or spondylolisthesis and no sign of instability on flexion or extension.  The disk spaces are preserved.

(638).  Lasser's impression was "musculoligamentous lower back pain with hypersensitivity." *Id*.  Lasser concluded that Plaintiff did not need back surgery, but that she might benefit from other types of treatments. *Id*.  During this same period Plaintiff was apparently still treating with Holder for pain management. (639, 635).

On May 11, 2012, Plaintiff was examined by Nurse Practitioner Cynthia Skovrinski, MS FNP-C ("Skovrinksi"), after she felt a popping sensation in her back while getting into her car. (635).  Skovrinksi reported that Plaintiff had tenderness over her thoracic spine and lumbar spine, and decreased range of motion. *Id*.  SLR testing caused a "pulling sensation" in the thoracic region. *Id*.  Skovrinski recommended that Plaintiff start physical therapy. (636).

Knee Pain

Plaintiff has had surgery on both knees (291), and persistent pain, particularly in her right knee.  On April 8, 2002, Bruce Klein, M.D. ("Klein") reported that he had performed "right knee arthroscopy and lateral release," and that Plaintiff would need rehabilitation. (306).  On August 10, 2010, Klein examined Plaintiff and noted that her right knee had a "very very easily subluxated patella" that "really wanders a lot." (294). Klein also observed "mild to moderate retropatellar crepitus." *Id*.  On September 15, 2010, Klein examined Plaintiff and reported that she was "tender over both medial and lateral patellar retinaculum with positive apprehension test and quite a bit of tenderness of the patella tendon with some mild bogginess." (295).  Klein opined that Plaintiff's right knee pain was "coming from her patellofemoral joint with patellar tendinitis." *Id*.  On October 29, 2010, Klein examined Plaintiff and reported that she had "tenderness over the patella" and "mild medial and lateral retinacular discomfort with tenderness to percussion over the patella." (297).  Klein observed that an MRI "demonstrated an osteochondral defect on the patella," to which he stated: "Unfortunately she has what I have always suspected here with her patella type injury and unfortunately she developed an osteochondral lesion." *Id*.  Klein indicated that he would "hold off" on surgical options,

8

though, because Plaintiff's back pain might prevent her from participating in the necessary post-surgery rehabilitation of the knee. *Id*.  On March 11, 2011, Klein reported that Plaintiff had crepitus in both knees, as well as "a patella alta type of alignment in her knees," and "some residual lateral tilting of the patella." (300).  Klein's impression was "lateral maltracking of the patella with associated patella alta." *Id*.  Klein indicated that surgery might help Plaintiff, but that he did not want to attempt surgery until the problem with her back was resolved. (301).  Klein recommended that Plaintiff use knee braces, ice the knee, and take anti-inflammatory drugs. *Id*.

Residual Functional Capacity Assessments by Treating Physicians

On May 8, 2012, Walk-Reinard completed an RFC evaluation, in which she noted that Plaintiff had a variety of medical problems, including pain in her back, knees and shoulder, for which she was being treated by both orthopedic specialists and pain-management specialists. (589).  When asked to describe the particular objective signs of Plaintiff's medical problems, Walk-Reinard referred the reader to the specialists' notes and the diagnostic test results. (589-590).  Walk-Reinard stated that during a six-hour workday (Plaintiff was working a 6-hour shift at the time) Plaintiff could sit for less than two hours and could stand and/or walk for about four hours. (591).  Walk-Reinard further stated that Plaintiff would need to take breaks every thirty minutes (591), and that Plaintiff was not capable of "sustaining full-time work (8 hours a day, 5 days a week)." (592).

On May 25, 2012, Holder completed a residual functional capacity assessment for Plaintiff that purports to assess Plaintiff's ability to work in light of her back pain. (628-632).  Holder indicated that Plaintiff's diagnoses were "chronic low back pain" and

"degenerative disc disease," and that her prognosis was "poor." (628)  When asked to describe any objective signs of Plaintiff's condition, Holder listed "reduced range of motion," consisting of decreased lumbar flexion, extension and rotation, as well as "tenderness,"  "muscle spasm," "muscle weakness" and "impaired sleep." (629).  Holder stated that Plaintiff's pain would "frequently" interfere with her attention and concentration, and that her oxycodone pain medication would make her drowsy. *Id*. Holder indicated that during an 8-hour workday, Plaintiff could sit, stand and/or walk for a combined total of less than six hours, and that she would need to take frequent breaks to walk around. (630).  Holder further indicated that Plaintiff would miss approximately four days of work per month due to back pain, and that she was not capable of sustaining full-time work. (631).

## VOCATIONAL HISTORY

Plaintiff dropped out of high school but later earned her GED.  Plaintiff has worked at a number of jobs, including a receptionist's position, which was categorized as unskilled work, at the light exertional level.(47).

## ACTIVITIES OF DAILY LIVING

Plaintiff and her four children live with Plaintiff's parents.  At the time of the hearing, the children ranged in age from seventeen to nine. (55).  Plaintiff indicates that her parents and children perform almost all household chores.  However, Plaintiff states that she can cook at the stove while sitting on a stool, as long as the cooking does not require lifting or placing things in the oven. (55).  Plaintiff also indicates that she is able to drive short distances and to go shopping approximately four times per week, consisting of "quick trips to get just what is needed." (193).  Plaintiff states that her parents' house is

a two-level structure, but that she essentially remains on the first floor in order to avoid having to use stairs. (56)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

THE ALJ'S DECISION

On August 17, 2012, the ALJ issued the decision that is the subject of this action. (19-28).  At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since April 15, 2011, the application date." (21).  At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "pain syndrome and bilateral knee problems." (21). At step three of the five-step analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (23).

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had the following RFC:

> [C]laimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b) except she can lift and carry up to ten pounds occasionally and frequently.  She can sit about six hours out of an eight-hour workday.  She can stand about four hours total and walk about four hours total in an eight-hour workday.  The claimant must alternate positions for ten minutes after every hour of walking.  She can push and pull up to ten pounds occasionally and frequently.  The claimant can occasionally operate hand controls with her left hand, but she can frequently operate hand controls with her right hand.  She can occasionally reach (including overhead), handle, finger and feel.  She can occasionally climb ramps, stairs, ladders and scaffolds.  She can occasionally balance, stoop, kneel, crouch and crawl.

(24).  In making that determination, the ALJ indicated that he found Plaintiff's statements about her pain not credible, to the extent that they suggested that she could do less than what he found that she could do. (24).  More specifically, the ALJ stated that although Plaintiff had several documented health problems, "her allegations of pain and the resulting limitations are not wholly supported by the objective medical findings." (24).

12

For example, with regard to Plaintiff's back pain, the ALJ indicated that he believed that she was exaggerating her pain and limitations, since x-rays, MRIs and CT scans "revealed no significant impairments in her bones, ligaments or tendons," and nerve conduction studies were normal. (21).[2]  On this point, though, the ALJ is apparently pitting his medical knowledge against that of Plaintiff's doctors, who performed numerous pain-relieving procedures on her over the years.  The ALJ also observed that, in October 2010 (396),  Holder declined to prescribe Plaintiff "narcotic" pain medication "because her pain was more musculoskeletal," with the suggestion being that Plaintiff was therefore untruthful when she testified that she took oxycodone twice a day for pain relief. (25).  However, on January 16, 2012, Holder reported that Plaintiff "reports stable pain control with continuation of her oxycodone." (519).  Moreover, in his RFC assessment dated May 25, 2012, Holder indicated that Plaintiff was taking oxycodone, and that it made her drowsy. (629).

With regard to Plaintiff's knee pain, the ALJ indicated that he believed that Plaintiff was exaggerating her pain and limitations, since, although she had "maltracking of her knees, some quadriceps atrophy and mild crepitus," "[t]here was no diagnostic evidence of any significant impairment associated with her complaints." (25).  As support for that point, the ALJ twice referred to Dr. Klein's purported statement that "x-rays of the claimant's right knee showed no impairment that would 'correspond with any significant

---

[2]On this point, the ALJ's suggestion that Plaintiff's diagnostic testing was all essentially "normal," *see, e.g.* (25), not only contradicts the medical evidence but also contradicts the explanation of the disability examiner who initially denied Plaintiff's claim, which, as set forth above, acknowledged that the diagnostic testing showed certain abnormalities. *See,* (79) ("LS spine MRI (11-03-03) indicated a protrusion at L5-S1 with a[n] annular tear and degenerative changes at L5-S1.  Bilateral knee x-rays (03-11-11) indicated lateral maltracking of the patella with associated patella alta.").  The disability examiner also indicated that Plaintiff could only perform sedentary work, while the ALJ found that she could perform light work.

13

pain' alleged by the claimant." (25, 26) (both times citing Ex. 4F, pp. 2-3 and 20F, pp. 2-

3).  However, the ALJ took that quote out of context.  The actual quote by Klein was as

follows:

> Three views of the right knee show no fracture or dislocation.  She does
> have patella alta.  There is a bit of an irregularity of the inferior aspect of
> the patella itself.  *This does not correspond with any significant pain, more
> of the pain is down over the distal patella tendon and not proximally.*

(292) (emphasis added).  Accordingly, Klein was not indicating that Plaintiff did not have

a condition that could cause significant pain, as the ALJ suggested, but rather, he was

indicating that the pain was caused by something other than the irregularity in the inferior

aspect of the patella.  As already discussed, Klein clearly believed that Plaintiff was

experiencing pain secondary to patellar tendinitis and an osteochondral lesion, which he

would have attempted to alleviate with surgery, but for Plaintiff's back problem.

The ALJ further found that Plaintiff's statements regarding the extent of her pain

were contradicted by her activities of daily living. (25).  Specifically, in that regard, the

ALJ stated: "The claimant reported that she drives and goes shopping approximately four

times a week.  In February 2011, she told her treating physician that she was carrying

wood outside." (25).  However, as already mentioned above, Plaintiff indicated that her

trips to the store were quite brief, and that she otherwise could not perform any

household chores, with the exception of light cooking.  Furthermore, the ALJ's reference

to Plaintiff carrying wood does not support his credibility finding, since what Plaintiff

actually stated was that she "lost control of carrying the wood and she had to drop the

wood since she could not tolerate the pain any longer, and she went to the emergency

room at Penn Yan Hospital where they said she had tendonitis." (515).

The ALJ  also determined that he could not give controlling weight to the opinions of Walk-Reinard, Holder or Klein, since they were purportedly not consistent with the medical record.  In that regard, however, the ALJ relied on his own interpretation of the medical record, as he did not obtain any opinions from independent medical consultants, which is unusual in the Court's experience.  In other words, the ALJ rejected the conclusions of Plaintiff's treating physicians based on his own evaluation of the record and without obtaining any contrary medical evidence.

In any event, based upon his RFC finding, the ALJ found, at step four of the five-step sequential analysis, that Plaintiff can perform her past relevant work as a receptionist (27), and that she is therefore not disabled.

## DISCUSSION

Plaintiff contends that the Commissioner's determination should be reversed, since the ALJ's credibility determination, and his RFC determination, were affected by error of law and/or were not supported by substantial evidence.  For the reasons mentioned above, the Court agrees with Plaintiff.  More specifically, the Court finds that the ALJ's RFC determination is improperly based on his own opinion of the medical record, as opposed to competent medical opinions. *See, Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.  While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him.") (citation and internal

quotation marks omitted); *see also, Hilsdorf v. Commissioner of Social Sec.*, 724 F.Supp.2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error.").  Furthermore, several of the reasons that the ALJ gave for discrediting Plaintiff are not supported by substantial evidence, as already discussed.

However, the question is whether the matter should be remanded for further administrative proceedings, or whether it should be remanded solely for the calculation of benefits, where, as here, the ALJ's determination was made at step four of the five-step sequential analysis, and where the Commissioner did not obtain any contrary independent medical evidence.  There is authority that remand for calculation of benefits is not appropriate where an ALJ finds that the claimant is not disabled at step four. *See, e.g., Brickhouse v. Astrue*, 331 Fed.Appx. 875, 877-878 (2d Cir. Jun. 23, 2009) ("Because the ALJ found that Brickhouse was able to perform her past work, this fifth step was never performed.  Accordingly, the Commissioner has not had the opportunity to try to show that there is other work that Brickhouse can perform, and we cannot order an award until the Commissioner has had that chance.") (citation omitted).  On the other hand, remand for calculation of benefits may be appropriate where remand for further proceedings would serve no purpose, such as where the record could lead only to a finding that the claimant is disabled. *See, Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.").

Here, although the Commissioner did not obtain contrary independent medical opinions, the record is nevertheless not entirely consistent as to why Plaintiff is disabled. Most notably, the Court observes that while Holder and Walk-Reinard both opine that Plaintiff cannot work, they do so for different reasons.  Specifically, Holder indicates that Plaintiff can sit for four hours, but is limited to standing/walking for less than two hours (630), while Walk-Reinard indicates that Plaintiff can walk/stand for four hours, but is limited to sitting for less than two hours. (591).  If Holder is correct as to Plaintiff's ability to sit, and if Walk-Reinard is correct as to Plaintiff's ability to walk/stand, then Plaintiff is most likely not disabled.  Similarly, although Holder indicated that Plaintiff would likely miss four days of work per month (631), Walk-Reinard did not indicate that Plaintiff would miss any days of work. (592).  Consequently, the Court finds that the matter should be remanded for further administrative proceedings.

## CONCLUSION

Plaintiff's application [#9] is granted, defendant's application [#15] is denied, and this matter is remanded to the Commissioner for further administrative proceedings, pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
       November 13, 2014

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge